**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | Case No. |
| **v.** | |
| **BENJAMIN CONDE,** | **COMPLAINT** |
| **Defendant,** | **JURY TRIAL DEMANDED** |
| **and** | |
| **ESSEX GLOBAL INVESTMENT CORP. and FACULTAS CAPITAL MANAGEMENT, INC.,** | |
| **Relief Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Benjamin Conde ("Conde") and Relief Defendants Essex Global Investment Corp. ("Essex") and Facultas Capital Management, Inc. ("Facultas"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      Defendant Benjamin Conde orchestrated and implemented a fraudulent scheme, beginning in at least March 2017 and lasting until approximately July 2017, to manipulate the market price and trading volume of Renewable Energy and Power, Inc. ("RBNW") securities. Conde realized more than $3.1 million in trading profits, while causing at least $2.4 million in losses to approximately 68 unsuspecting retail investors.

2.      The fraudulent scheme began when Conde acquired large blocks of RBNW shares through convertible notes purchased from RBNW by Essex, an entity that Conde controlled.

3.      To facilitate the fraudulent scheme, Conde retained a "boiler room"[1] called PowerTradersPress.com Inc. ("Power Traders Press"), which was operated and controlled by the Boiler Room Principal, to promote artificially, or fraudulently "pump," the market price and trading volume of RBNW shares.  Conde compensated Power Traders Press for its role in the scheme.

4.      Conde, the Boiler Room Principal, and other Power Traders Press employees working at the Boiler Room Principal's direction engaged in manipulative trading of RBNW, executing "matched" and "wash" trades designed to artificially raise the market price and trading volume of RBNW and give the false appearance of active trading and a rising price for the security.  Conde used trading accounts in the names of Essex and Facultas, entities he controlled, to engage in this manipulative trading.

5.      Simultaneously, the Boiler Room Principal implemented a large-scale promotional campaign touting RBNW, instructing Power Traders Press employees to target retail investors – specifically, the elderly and unsophisticated – and aggressively solicit them to purchase RBNW stock.  The Boiler Room Principal and Power Traders Press sales personnel did not disclose that the Boiler Room Principal, other Power Traders Press employees, Conde, Essex, and Facultas were at the same time engaging in manipulative trades designed to artificially increase the trading volume and market price of RBNW shares.

---

[1]      "'Boiler room' activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer." *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 874 (S.D. Fla. 1974).

6. As a result of this fraudulent scheme, Conde artificially "pumped" the price of RBNW above its true market value and realized millions of dollars in illegal proceeds when he sold, or "dumped," the security at artificially high prices to retail investors. Meanwhile, these unsuspecting investors lost millions.

## VIOLATIONS AND RELIEF SOUGHT

7. By virtue of the conduct alleged herein, Defendant Conde has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)(1)], and/or Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

8. The Court should permanently enjoin Defendant Conde from violating the securities laws; order Defendant Conde to pay disgorgement and prejudgment interest thereon; order Defendant Conde to pay disgorgement and prejudgment interest thereon on a joint and several basis for the amounts received by Relief Defendants Essex and Facultas; order Relief Defendant Essex to pay disgorgement and prejudgment interest thereon for the amounts received by Relief Defendant Essex; order Relief Defendant Facultas to pay disgorgement and prejudgment interest thereon for the amounts received by Relief Defendant Facultas; order Defendant Conde to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; impose a penny stock bar against Defendant Conde pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and order any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

9.      The Court possesses jurisdiction over this action pursuant to Sections 20(b),

20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections

21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

10.      Venue lies in this District pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of

the transactions, acts, practices and courses of conduct constituting the violations alleged in this

Complaint occurred within the Eastern District of New York.  Among other things, Power

Traders Press's principal place of business while the scheme alleged in this Complaint took place

was in the Eastern District of New York.

11.      In connection with the conduct alleged in this Complaint, Defendant Conde,

directly or indirectly, singly or in concert with others, made use of the means or instrumentalities

of interstate commerce, and made use of means or instruments of transportation or

communication in interstate commerce, and of the mails and of the facilities of a national

securities exchange to carry out the unlawful conduct alleged in this Complaint.

## DEFENDANT

12.      **Benjamin Conde**, age 56, is a resident of Fairfield, New Jersey.  Conde is the

President of Essex Global Investment Corp., an entity that provides financing for microcap

issuers, and Facultas Capital Management, Inc.

## RELIEF DEFENDANTS

13.      **Essex Global Investment Corp.** ("Essex") is a Nevada entity incorporated on

July 17, 2013.  Conde is the President of Essex, a signatory on its bank and brokerage accounts,

and exercised control over the Essex brokerage account by conducting transactions in the

4

account.  Essex received at least $3.1 million in trading proceeds from the Federal securities law violations alleged in this Complaint, in exchange for no consideration and without any legitimate claim to those funds.

14.     **Facultas Capital Management, Inc**. ("Facultas") is a Texas entity incorporated on October 17, 2014.  Conde is the President and sole owner of Facultas, the sole signatory on its trading and bank accounts, and exercised control over the Facultas brokerage account by conducting transactions in the account.  Facultas received at least $15,000 in trading proceeds from the Federal securities law violations alleged in this Complaint, in exchange for no consideration and without any legitimate claim to those funds.

**ISSUER**

15.     **Renewable Energy and Power, Inc.** ("RBNW") is a Nevada corporation with its principal place of business in North Las Vegas, Nevada.  During the time period relevant to this Complaint, the common stock of Renewable Energy and Power, Inc. (ticker symbol: RBNW) was registered under 12(g) of the Exchange Act and was quoted on the OTC Pink.  RBNW's securities qualified as a "penny stock" because they were equity securities:  (1) that were not an "NMS stock," as defined in 17 C.F.R. 242.600(b)(47); (2) traded below five dollars per share during the time period relevant to this Complaint; (3) whose issuer had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1) under the Exchange Act, 17 C.F.R. § 240.3a51-1; and (4) did not meet any of the other exceptions from the definition of "penny stock" contained in Rule 3a51-1 under the Exchange Act.

## OTHER RELEVANT ENTITY AND INDIVIDUALS

16. **Power Traders Press** is a New York entity incorporated on November 4, 2014. Power Traders Press has been known by several aliases, including TradeMastersPro.com, Inc., Dacona Financial LLC, and MyStreetResearch.com, Inc. Between at least 2014 and 2017, Power Traders Press operated as a boiler room.

17. **Boiler Room Principal** is an individual that controlled the Power Traders Press boiler room and who was retained by Conde to engage in manipulative trading in RBNW and to persuade retail investors to purchase RBNW shares through a cold-calling campaign.

18. **Individual A** is a promoter of microcap stocks who introduced Conde to the Boiler Room Principal and served as an intermediary to facilitate Conde's payment of RBNW trading profits to the Power Traders Press boiler room.

19. **Employee 1** worked at Power Traders Press during the time period relevant to this Complaint and assisted the Boiler Room Principal in persuading retail investors to purchase RBNW.

## GLOSSARY OF TERMS USED IN THIS COMPLAINT

20. A "matched trade" is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

21. "Scalping" is a fraudulent practice of encouraging and inducing third parties to purchase a security without disclosing that the promoter had some financial interest in that security, such as receiving compensation from the issuer for promoting the security, or owning

that security and then selling it contemporaneously with the promotional activity to profit from the market activity that follows the promotion.

22.     A "wash trade" is an order to buy or sell securities resulting in no change of beneficial ownership for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

## FACTUAL ALLEGATIONS

**I.     The RBNW Manipulative Trading Scheme**

**A.     Conde Acquired and Deposited RBNW Shares**

23.     RBNW was incorporated in 2012 and is headquartered in Las Vegas, Nevada. According to public filings with the Commission, RBNW plans to provide renewable energy that is competitive with fossil fuels.

24.     From March through July 2017, Conde, through Essex, acquired approximately 9.5 million shares of RBNW from the issuer through a convertible redeemable note, and deposited the shares into Essex's brokerage account at Broker Dealer A.  Essex purchased the convertible note from RBNW on March 15, 2016, with an aggregate principal amount of $68,125.85.  The note entitled Essex to convert the debt into common stock at the price of $.001 per share or lower, depending on certain conditions.

25.     From March 20, 2017 through June 27, 2017, Conde, through Essex, notified RBNW on eight separate occasions that it was converting a portion of the note into shares, resulting in RBNW issuing 9.5 million shares to Essex, which were then deposited into Essex's account, held at Broker Dealer A and controlled by Conde.  Conde used Essex's account at Broker Dealer A in connection with the fraudulent scheme to manipulate the trading of RBNW stock.

26.     In connection with the deposit of the shares into Essex' account at Broker Dealer A, Conde misrepresented to Broker Dealer A Essex's intended use of the RBNW shares.  Before accepting the shares for deposit, Broker Dealer A required Essex to submit several forms, including a "Deposited Securities Representation Form."  On a form signed by Conde as Chief Executive Officer of Essex on April 21, 2017, he answered "No" to the question, "Have you solicited or made arrangement for the solicitation of buy orders in connection with this sale?"

27.     In the portion of the Deposited Securities Representation Form requiring Conde to "acknowledge[]" and agree" to certain conditions, Conde falsely confirmed to Broker Dealer A that Essex was "not engaged in any joint, collaborative, parallel, orchestrated, or coordinated action with any other person toward a common goal regarding the Securities" held in the account, and would "not receive or rely on order execution suggestions, instructions, or similar advice from any other person in connection with the sale of the Securities."  Conde made this statement at the same time he used Essex's account at Broker Dealer A to engage in coordinated matched trades with victims and the Power Traders Press boiler room.

28.     On June 12, 2017, while Power Traders Press' RBNW promotional campaign was ongoing, Conde submitted additional shares for deposit at Broker Dealer A and was required to submit an "OTC Securities Deposit Request Form."  On the form, Conde made further misrepresentations and omissions, including failing to disclose to Broker Dealer A, in response to specific questions, that Conde had been subject to a criminal charge involving fraudulent conduct, that Conde and Essex had made arrangements for the solicitation of buy orders in connection with the resale of the RBNW shares, and that Essex had made payments to a boiler room to promote RBNW.

**B.**      **Conde Engaged Power Traders Press to Pump RBNW Stock Through Aggressive Sales Tactics**

29.      In approximately March 2017, Conde engaged the Power Traders Press boiler room to inflate artificially the price and trading volume of RBNW stock.  The Boiler Room Principal and Conde communicated about the RBNW scheme using an application that provides encrypted messaging with the option for messages to be automatically deleted shortly after transmission ("the Encrypted Messaging App").

30.      Pursuant to the agreement between Conde and the Boiler Room Principal, the Boiler Room Principal instructed Power Traders Press employees to call elderly, unsophisticated, and easily coerced victims, and aggressively encourage them to purchase RBNW securities at prices and quantities that were coordinated between Power Traders Press and Conde.  The Power Traders Press sales personnel did not inform the victims on the calls that Essex, through Conde, had compensated the Boiler Room Principal and, in turn, Power Traders Press, to promote the stock.  Additionally, the sales personnel did not tell the victims that Conde's RBNW sales were made contemporaneously with the promotional activity, to allow Conde to profit from the market activity that follows the promotion – a practice known as "scalping."

31.      While Power Traders Press was aggressively promoting RBNW securities, Essex and Conde frequently spoke with the Boiler Room Principal, using the Encrypted Messaging App, to review and coordinate the number of RBNW shares purchased by victims of the scheme.  Additionally, Conde and Individual A reviewed Essex's trading records to determine the amount of money Conde owed to the boiler room as compensation for persuading victims to purchase RBNW shares, at the same time that Essex was selling into the market.  After determining the realized trading profits, the Boiler Room Principal created fictitious invoices to disguise the payments to Power Traders Press from Conde based on the RBNW trading proceeds.  The

invoices, which were issued to and from a number of sham entities associated with Conde, the Boiler Room Principal, and Individual A, falsely stated that the amounts owed to the boiler room were the result of "consulting man hours," billed at $250 hour.  In fact, the amounts were specifically tied to RBNW trading profits realized by Essex.

32.     Between approximately April and July 2017, the Power Traders Press boiler room received approximately $1.1 million as compensation in promoting RBNW stock, which was taken from the RBNW trading proceeds generated by Conde and transmitted through Individual A.

### C.     <u>Conde Manipulated the Price of RBNW Stock</u>

#### 1.     Conde's Wash and Matched Trades with Power Traders Press

33.     Conde and the Boiler Room Principal carefully coordinated the timing of Power Traders Press's promotional campaign, and designed it to coincide with manipulative trading activity by Conde, the Boiler Room Principal, and the Power Traders Press boiler room employees, working at the Boiler Room Principal's direction.

34.     For example, between March  and July 2017, Conde executed wash and matched trades designed to manipulate the volume and price of RBNW stock in coordination with the Boiler Room Principal and Power Traders Press boiler room employees working at his direction. Conde executed these manipulative trades using two accounts controlled by Conde – a brokerage account in the name of Essex held at Broker Dealer A, and a brokerage account in the name Facultas, held at Broker Dealer B.

- On March 28, 2017, at 3:50 p.m., Conde sold 5,000 shares of RBNW from his Facultas account for $0.30 per share, and Power Traders Press purchased 2,500 shares of RBNW for $0.30 per share.

10

- On June 1, 2017, from 12:30 p.m. to 12:33 p.m., Conde spoke with Broker Dealer B, requesting to sell 2,500 shares of RBNW at $0.28 per share.  At 12:32 p.m., Conde sold 2,500 shares of RBNW from his Facultas account for $.028 per share, and Power Traders Press purchased 2,500 shares of RBNW for $.28 per share.

- On June 6, 2017, from 10:17 a.m. to 10:23 a.m., Conde spoke with Broker Dealer A. At 10:23 a.m., Conde purchased 20,000 shares of RBNW from his Facultas account for $0.26 per share and, at the same time, sold 10,000 shares of RBNW from his Essex account for $0.26 per share.

- On June 27, 2017, at 10:00 a.m., Conde called Broker Dealer B, requesting to purchase 15,000 shares of RBNW at the offering price.  At 10:04 a.m., Conde purchased 12,500 shares of RBNW from his Facultas account for $.30 per share and, at the same time, sold 12,500 shares of RBNW from his Essex account for $0.30 per share.

### 2.   Matched Trades with Victims

35.    In addition to executing wash and matched trades with the Boiler Room Principal and the Power Traders Press employees working at his direction, Conde and the Boiler Room Principal coordinated matched trades with victims of the fraudulent scheme.  While speaking to the victims, the Boiler Room Principal, Power Traders Press sales personnel working at his direction, and Employee 1 instructed victims to enter buy orders for RBNW stock in certain amounts and at certain prices, but did not disclose that they were matching the victims' RBNW trades.

36.     In many cases, the Boiler Room Principal would then inform Essex via the Encrypted Messaging App of the incoming purchase order so that Conde could place a corresponding sell order to match the victim's trade.  For example:

- On April 5, 2017, sales personnel at Power Traders Press, working at the Boiler Room Principal's direction, contacted Victim A at 10:06 a.m.  At 10:09 a.m., Conde called Broker Dealer A.  At 10:11 a.m., Victim A's purchase order of 50,000 shares of RBNW for $0.43 per share was executed at the same time that the Essex brokerage account, controlled by Conde, sold 50,000 shares of RBNW for $0.43 per share.

- On April 27, 2017, at 12:13 p.m., sales personnel at Power Traders Press, working at the Boiler Room Principal's instruction, called Victim B and spoke with the victim for seven minutes.  At 12:33 p.m., Conde called Broker Dealer A.  At 12:34 p.m., the same sales employee at Power Traders Press again called Victim B.  At the same time, while on the phone with the boiler room, Victim B purchased 10,000 shares of RBNW for $0.47 per share.  Also at 12:34 p.m., the Essex brokerage account, controlled by Conde, sold 10,000 shares of RBNW for $0.47 per share.

- On May 15, 2017, at 2:06 p.m. and 2:08 p.m., a member of the Power Traders Press sales force, working at the Boiler Room Principal's direction, called Victim C.  At 2:08 p.m., Conde called Broker Dealer A.  At 2:09 p.m., Victim C purchased 50,000 shares of RBNW for $0.44 per share, and the Essex brokerage account, controlled by Conde, sold 50,000 shares of RBNW for $0.44 per share.

- On May 22, 2017, at 11:31 a.m., a sales employee at Power Traders Press, working at the Boiler Room Principal's direction, called Victim C and, at 11:33 a.m., Conde called Broker Dealer A.  At 11:34 p.m. Victim C purchased 30,000 shares of RBNW

for $0.39 per share, and the Essex brokerage account, controlled by Conde, sold 30,000 shares of RBNW for $0.39 per share.

- On June 26, 2017, a sales employee at Power Traders Press, working at the Boiler Room Principal's direction, called Victim C at 9:38 a.m., and spoke with the victim for three minutes.  At 9:46 a.m., the boiler room again called Victim C and, at 9:51 a.m., Conde called Broker Dealer A.  At 9:52 a.m., Victim C purchased 15,000 shares of RBNW for $0.30 per share and the Essex brokerage account, controlled by Conde, sold 15,000 share of RBNW for $0.30 per share.

37.     In total, Conde entered into at least 49 matched and wash trades between March 2017 and approximately mid-July 2017.

## II.     Conde Recognized Over $3.1 Million in Illegal Profits Selling RBNW Shares

38.     Between approximately April and July 2017, Conde generated more than $3.1 million in RBNW proceeds through the sale of more than eight million shares of RBNW.

39.     Approximately $1.4 million of these trading proceeds were immediately transferred to an entity in the name of Individual A.  Individual A retained $300,000 of the funds as compensation for his role as a conduit between Conde and the Power Traders Press boiler room, and then wired the remainder of the funds, approximately $1.1 million, to accounts affiliated with Power Traders Press, as compensation for its role in the scheme.

40.     For example, on March 24, 2017, Conde deposited 1.2 million shares of RBNW into his Essex account at Broker Dealer A.  Between March 27 and 31, 2017, the Essex account at Broker Dealer A sold 1.2 million shares of RBNW, generating trading profits of more than $341,000.  On April 4, 2017, Conde wired $200,000 from the Essex account at Broker Dealer A to a bank account in the name of Essex that he controlled.  The same day, Conde wired $203,400

13

from his Essex bank account to a bank account controlled by Individual A ("Individual A's Bank Account"). Also on April 4, 2017, Individual A wired a total of $177,600 from Individual A's Bank Account to accounts affiliated with Power Traders Press, including accounts controlled by the Boiler Room Principal.

41.     Conde again deposited 1.2 million shares of RBNW into his Essex account at Broker Dealer A on April 4, 2017. Between April 4 and 6, 2017, Conde sold more than 1.1 million shares of RBNW from the Essex account for approximately $473,500.

42.     In addition, on April 7, 2017, Conde wired $290,000 from his Essex brokerage account at Broker Dealer A to an Essex bank account. That same day, Conde again deposited 1.2 million shares of RBNW into his Essex account at Broker Dealer A. Between April 7 and 10, 2017, Conde sold 360,000 shares of RBNW from his Essex account, generating trading proceeds of more than $150,000. On April 11, 2017, Conde wired $275,000 from the Essex brokerage account to the Essex bank account. The following day, Conde wired $343,500 to Individual A's Bank Account, and Individual A wired $300,000 from Individual A's Bank Account to accounts affiliated with Power Traders Press, including accounts controlled by the Boiler Room Principal.

43.     Between April 11 and 28, 2017, Conde sold more than 1.1 million shares of RBNW from his Essex brokerage account at Broker Dealer A, generating trading proceeds of more than $477,770. Beginning on April 13, 2017, Conde began to wire these funds out of the Essex brokerage account. On April 13, 2017, Conde wired $150,000 from the Essex account at Broker Dealer A to his bank account in the name of Essex. On April 19, 2017, Conde wired $91,300 from the Essex bank account to Individual A's Bank Account. That same day, Individual A wired $80,000 of these funds from Individual A's Bank Account to an account

affiliated with Power Traders Press.  On April 20 and 26, 2017, Conde wired $100,000 and $150,000, respectively, from the Essex brokerage account to the Essex bank account.  On April 28, 2017, Conde wired $92,000 from the Essex bank account to Individual A's Bank Account. On April 28 and May 1, 2017, Individual A wired $30,000 and $50,800, respectively, from Individual A's Bank Account to accounts affiliated with Power Traders Press.

44.     The boiler room operation and market manipulation by Conde (including through Essex and Facultas), the Boiler Room Principal, and the Power Traders Press employees working at the Boiler Room Principal's direction created an immediate and significant impact on the market in RBNW.  From February through March 24, 2017, RBNW's trading volume was virtually nonexistent, with an average volume of only 461 shares each day.  From March 27, 2017, when the Boiler Room Principal and the Power Traders Press sales force were engaged to promote the stock, until July 11, 2017, RBNW's average trading volume rose to 266,856 shares per day.  Similarly, RBNW's share price hovered between $0.20 and $0.30 prior to the involvement of Power Traders Press, but surged to a high of $0.48 on April 24, 2017, after the Boiler Room Principal instructed the Power Traders Press sales personnel to recommend RBNW to victim investors and facilitate the manipulative trading.

45.     Following the termination of the scheme, RBNW's share price plummeted.  By the end of July 2017, RBNW's closing price was $0.005 per share, a 98% decrease from its July 11, 2017 closing price.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder

#### (Conde)

46.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 45 as if fully set forth fully herein.

47.     From at least March 2017 through approximately July 2017, Conde engaged in a

fraudulent scheme to manipulate the market in RBNW securities.  By this conduct, Conde, in

connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by

the use of the means or instrumentalities of interstate commerce, or of the mails, or of the

facilities of a national securities exchange, with scienter, has employed devices, schemes, and

artifices to defraud, and has engaged in transactions, acts, practices, and courses of business

which operated as a fraud or deceit.

48.     By reason of the foregoing, Conde directly or indirectly, singly or in concert, have

violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1) of the Securities Act

#### (Conde)

49.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 45 as if fully set forth herein.

50.     From at least March 2017 through approximately July 2017, Conde engaged in a

fraudulent scheme to manipulate the market in RBNW securities.  By this conduct, Conde,

directly or indirectly, singly or in concert, in the offer and sale of any securities, by the use of the

means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth employed devices, schemes or artifices to defraud.

51.     By reason of the foregoing, Conde directly or indirectly, singly or in concert, have violated, and unless enjoined will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### THIRD CLAIM FOR RELIEF

### Violations of Section 17(a)(3) of the Securities Act

### (Conde)

52.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

53.     From at least March 2017 through approximately July 2017, Conde engaged in the fraudulent manipulation of RBNW securities.  By this conduct, Conde, directly or indirectly, singly or in concert, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

54.     By reason of the foregoing, Conde directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 9(a)(1) of the Exchange Act

#### (Conde)

55.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 45 as if fully set forth herein.

56.     Since at least March 2017 through approximately July 2017, Conde, directly or

indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in, or the means or instrumentalities of, interstate commerce or by the use of the

mails, knowingly or recklessly, and for the purpose of creating a false or misleading appearance

of active trading in the securities of RBNW or a false or misleading appearance with respect to

the market for such securities, (a) have effected transactions in such securities which involved no

change in the beneficial ownership thereof; (b) have entered an order or orders for the purchase

of such securities with the knowledge that an order or orders of substantially the same size, at

substantially the same time, and at substantially the same price, for the sale of any such

securities, had been or would be entered by or for themselves or different parties; and/or (c) have

entered, are entering, or are about to enter an order or orders for the sale of such securities with

the knowledge that an order or orders of substantially the same size, at substantially the same

time, and at substantially the same price, for the purchase of such securities had been or would

be entered by or for themselves or different parties.

57.     By reason of the foregoing, Conde has violated, and unless enjoined will continue

to violate, Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)(1)].

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

**(Essex Global Investment Corp. and Facultas Capital Management, Inc.)**

58.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

59.     Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

60.     As alleged in this Complaint, Essex and Facultas received funds and property that were the proceeds, or are traceable to the proceeds, of the Defendant's Federal securities law violations that are alleged in this Complaint.  Essex and Facultas had no legitimate claim to these proceeds, and gave no consideration in exchange for receipt of those funds.

61.     Essex and Facultas obtained the funds and property alleged above as part of and in furtherance of the Federal securities law violations alleged in this Complaint and under circumstances in which it is not just, equitable, or conscionable for it to retain the funds and property.  They were unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Finding that Conde violated the Federal securities laws and rules promulgated thereunder as alleged against him in this Complaint.

**II.**

Permanently enjoining Conde and his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, directly or indirectly, from committing future violations of each of the Federal securities laws and rules promulgated thereunder pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]

**III.**

Ordering disgorgement as a result of the violations of the Federal securities laws alleged herein and the rules promulgated thereunder that are alleged in this Complaint, plus prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], against Defendant Conde, Relief Defendants Essex Global Investment Corp. and Facultas Capital Management, Inc., and Defendant Conde on a joint and several basis for the amounts received by Relief Defendants Essex Global Investment Corp. and Facultas Capital Management, Inc.

**IV.**

Ordering Conde to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

**V.**

Ordering Conde to be barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VI.

Granting such other and further relief as the Court may deem just and proper.

Dated:        September 23, 2019                    Respectfully submitted,

Cecilia B. Connor (CB5956)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
215-597-2950
connorce@sec.gov

James E. Smith (motion for admission *Pro Hac Vice* Pending)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-5881
smithja@sec.gov

Matthew F. Scarlato (motion for admission *Pro Hac Vice* Pending)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-3749
scarlatom@sec.gov

OF COUNSEL:

Amy L. Friedman
Andrew M. Elliott
SECURITIES AND EXCHANGE
COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985